[Civ. No. 48051. Second Dist., Div. Three. July 27, 1976.]

PERRY BUCCERY, Plaintiff and Appellant, v.
GENERAL MOTORS CORPORATION et al.,
Defendants and Respondents.

536

COUNSEL

Peacock & Sullivan and Carl M. Hovland for Plaintiff and Appellant.

Hillsinger & Costanzo, Darrell A. Forgey, Early, Maslach, Boyd & Leavey and Maryann M. Seltzer for Defendants and Respondents.

OPINION

POTTER, J.—Plaintiff Perry Buccery appeals from a judgment in favor of defendants General Motors Corporation and Champion Chevrolet[1] rendered upon granting of defendants' motions for nonsuit.

Plaintiff's complaint sought damages for personal injuries arising out of a rear-end collision in which his Chevrolet LUV (Light Utility Vehicle) pick-up truck was struck by a Chevrolet El Camino driven by James F. Willett. Plaintiff's LUV was marketed by General Motors Corporation and Champion Chevrolet was the dealer through whom plaintiff purchased it. The negligence cause of action against Willett was settled and the case proceeded to trial against defendants General Motors Corporation and Champion Chevrolet "on a theory of strict liability."

Defendants produced evidence showing that the Willett vehicle struck plaintiff's vehicle with a relatively mild impact. Willett testified that at the point of impact his vehicle was not travelling more than five m.p.h. in

---

[1]Actually, the judgment entered by the court only mentions defendant General Motors Corporation. This court has, however, caused the original file in the superior court to be transmitted to this court pursuant to rule 12(a), California Rules of Court. It contains the original minute entry as follows: ."Plaintiff rests. Out of the presence of the jury, defendants move the Court for a judgment of nonsuit. Said motion is granted. The jury is discharged." The absence of a formal judgment in defendants' favor appears to have been a clerical error which, in view of the disposition of the matter, need not be corrected.

excess of the speed of plaintiff's vehicle. This testimony was confirmed by plaintiff's expert witness, an automotive engineer with extensive experience in vehicle testing to determine the "damage produced on the vehicle for a given speed and a certain kind of crash, and to study the response of occupants within the vehicle."

The impact was, however, sufficient to cause the rear of plaintiff's head to strike the window in the back of the cab of his vehicle. There was no padded head restraint in the LUV and the top of the seat was well below head level.

Plaintiff's automotive engineer expert testified that the lack of a head restraint contributed substantially to the impact upon plaintiff's head, increasing it from approximately 10-G to as much as 167-G. According to this expert, an average person would not sustain an injury with a 10-G impact produced by a "reasonably deformable surface." The witness described an evaluation undertaken by him in 1970 of the Isezu Model 126 Light Utility Vehicle, which was substantially the same vehicle as the LUV. He stated that the vehicle evaluated by him included head restraints.

Plaintiff's expert was of the opinion that a vehicle manufactured in 1973 for use in the United States without head restraints was "of unsafe design" and that the lack of such head restraints was "a product defect." He pointed out that in 1973 (1) head restraints were an accepted "valid safety device," (2) that there were no technical problems presented in "putting head restraints on vehicles like Luv trucks" (that is, "fitting head restraints in a vehicle like this is both feasible and would be beneficial"), and (3) that the increase in the cost of the car would be "certainly a very small percentage."

During the direct examination of plaintiff's expert, it was brought out that restraints have been required by federal regulations on all passenger cars produced since January 1, 1969. On cross-examination, it was brought out that the witness believed that the federal safety standard requiring head restraints did not apply to "trucks and multipurpose vehicles."

The evidence with respect to plaintiff's injury resulting from the impact between the back of his head and the rear window of the cab

supported his claim for substantial damages. Plaintiff described symptoms immediately following the accident, including unconsciousness, nausea, severe headache and imbalance. He was hospitalized for approximately a month and did not return to his employment for 11 months. Plaintiff's treating physician made an original diagnosis of "cerebral concussion" which he thought was caused by the blow to plaintiff's head. Another doctor who examined plaintiff for the purpose of testimony was also of the opinion that plaintiff had "a cerebral concussion . . . due to the accident."

At the time of trial plaintiff's recovery, though stable, was far from complete. Both doctors agreed that he was peculiarly susceptible to traumatic injury to his brain, having suffered a degree of encephalopathy on various prior occasions when stress, trauma or infection "aggravated the preexiting disposition towards this type of result." There was, however, substantial evidence from plaintiff, from his daughter, and from his wife, as well as the doctor's testimony, that his condition immediately prior to the accident was far more satisfactory than it had been at any time since the accident.

Both defendants raised the defense of assumption of risk, and plaintiff was examined extensively concerning his knowledge of the alleged defect and the hazards presented thereby. Plaintiff purchased the vehicle in March 1973. The accident occurred October 8, 1973. According to plaintiff's testimony, before purchasing the vehicle he did not notice the lack of head restraints but that shortly thereafter he did notice their absence and "the small distance between the seat and the back of the cab" and "thought I'd better get something back there." When asked if he wanted head restraints "because you felt that if you did get involved in a rear-end accident, you were liable to hit your head on a back window," plaintiff answered, "That's precisely what I am trying to say. That's what I—why I wanted them." When plaintiff attempted to obtain head rests at Champion Chevrolet, the parts department said they did not have any and suggested that he try automobile accessories stores. Thereafter, every chance he had, plaintiff stopped at accessories stores and attempted to purchase head restraints. He tried several places without success. The closest he came was to find a padded rest that "had a couple of prongs that slipped over the back and over partially the front," but this accessory was not usable on the LUV seat which had no solid back. Plaintiff continued his efforts to find head restraints up to the time of the accident and "was even planning on making one."

On cross-examination, it was also developed that plaintiff did not consider purchasing a similar type pick-up "like the Ford Courier or the Toyota or the Datsun Pickup" or inquire as to whether they were equipped with head restraints. No evidence was offered, however, as to any such vehicles being so equipped except a deluxe model of the Toyota which was available by the time of the trial.

On redirect examination, plaintiff testified that he had not constructed any head restraints and knew nothing about their design. He also testified that he did not realize that in the absence of a head rest he would sustain a concussion from a five m.p.h. rear-end impact.

At the conclusion of plaintiff's case, both defendants moved for nonsuit. The grounds stated for the motion were specified by counsel for defendant General Motors. Counsel for Champion Chevrolet merely stated, "I guess I will have to join in the motion to make it complete as to the situation we are confronted with as on behalf of my client." The grounds specified by counsel for defendant General Motors were: (1) that there was no evidence of a defect inasmuch as the absence of head rests was patent, (2) that plaintiff's testimony established a defense of assumption of risk, and (3) that the evidence failed to show that but for the absence of head restraint plaintiff "who is peculiarly susceptible to this type of injury" would not have been injured.

In granting the motions for nonsuit, the court specified reasons as follows:

"THE COURT: This case points up the necessity for standards in the manufacture of products. It points up the fact that with regard to safety devices, safety precautions that are engineered into things, there is as many opinions as there are experts and there has been great debate over the use of certain types of safety devices.

"Now, those charged with the responsibility for adopting standards have done so; General Motors complied with those standards. General Motors has done nothing wrong in this case. There is nothing wrong with what they did, and I don't think that it is within the province of a jury to determine at the persuasion of very competent attorneys that what they did was wrong.

"I think that the standards have been set up, General Motors has complied with them, and there is no defect whatsoever in this case."

## Contentions

Appellant contends that there was substantial evidence to support a jury verdict in his favor. Defendants contend to the contrary that (1) the trial court correctly determined that General Motors complied with the safety standards required for pick-up trucks, (2) the only purported defect in the vehicle shown by plaintiff was one which was "known and observed by him," and (3) that the evidence, as a matter of law, established the defense of assumption of risk.

### Defendants' Compliance With Federal Motor Vehicle Safety Standards Does Not Preclude Imposition of Common Law Liability for Defective Product

The ground stated by the court for granting defendants' motion for nonsuit was defendants' compliance with the standards established under the National Traffic and Motor Vehicle Safety Act of 1966 (15 U.S.C. §§ 1381-1431). An examination of the standards promulgated by the Secretary of Transportation pursuant to 15 United States Code, section 1392, subdivision (a), confirms the accuracy of the testimony of plaintiff's expert that head restraints had been prescribed for all passenger vehicles since January 1, 1969, but that this standard is not applicable to trucks. (49 C.F.R. §§ 571.202, 571.3.)

15 United States Code, section 1397 prohibits the manufacture for sale, sale, offer for sale, delivery or importation into the United States of any substandard vehicle and thus impliedly permits the manufacture, sale, offer for sale, delivery or importation of vehicles which are in compliance with the standards established. However, subdivision (c) of 15 United States Code, section 1397 expressly negates any inference that compliance with the standard grants exemption from common law liability. Subdivision (c) reads: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."

In *Arbet* v. *Gussarson,* 66 Wis.2d 551 [225 N.W.2d 431], the Supreme Court of Wisconsin rejected the argument that Congress preempted the field of automobile safety regulation by authorizing the establishment of federal standards. Citing 15 United States Code, section 1397, subsection (c), the court said (225 N.W.2d at p. 438): "Thus Congress felt that federal regulations should be supplementary to the common law of products liability."

> *There Was Substantial Evidence*
> *That Plaintiff Was Injured as a*
> *Result of a Defect in the Vehicle*

As our Supreme Court said in *Elmore* v. *American Motors Corp.,* 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84]: "A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor."

In *Elmore,* a nonsuit in favor of a manufacturer in a products liability case was reversed. More recently, in another products liability case, *Hyman* v. *Gordon,* 35 Cal.App.3d 769 [111 Cal.Rptr. 262], this court reversed a nonsuit, citing and quoting *Elmore* as above.

In an earlier decision, our Supreme Court in *Sunset Milling & Grain Co.* v. *Anderson,* 39 Cal.2d 773, 779 [249 P.2d 24], stated the rule of review of judgments of nonsuit as follows: " 'A trial court must deny a motion for a nonsuit at the close of plaintiff's case "if there is . . . any substantial evidence, which, with the aid of all legitimate inferences favorable to the plaintiff, tends to establish the averments of the complaint, or, in other words, where the plaintiff's evidence is sufficient to support a judgment on the verdict. . . ." And as to our duty, "The uniform rule which an appellate court should follow in disposing of an appeal from a judgment of nonsuit is, that the court must view the evidence in the light most favorable to appellant, must disregard all inconsistencies and draw only those inferences from the evidence which can reasonably be drawn which are favorable to appellant. . . ." ' (*Golceff* v. *Sugarman,* 36 Cal.2d 152, 153 [222 P.2d 665]; *Solon* v. *Lichtenstein,* 39 Cal.2d 75, 77 [244 P.2d

907]; *Kirk* v. *Los Angeles Ry. Corp.,* 26 Cal.2d 833, 837-838 [161 P.2d 673, 164 A.L.R. 1].)"

Judged by these standards, the evidence presented in plaintiff's case was sufficient to support a jury finding that plaintiff was injured by a defect in the truck purchased from the defendants.

*There Was Substantial Evidence of a Defect*

■ Defendants challenge the sufficiency of the evidence of a defect upon the ground that the lack of a head restraint was patent and was in fact observed by plaintiff. Both assertions are factually correct. However, this does not foreclose a finding that the vehicle was defective.[2]

In *Luque* v. *McLean,* 8 Cal.3d 136 [104 Cal.Rptr. 443, 501 P.2d 1163], our Supreme Court disposed of the "latent-patent distinction" in strict liability cases. It said in that respect (8 Cal.3d at pp. 144-145):

"Defendants take the position that under California law a manufacturer is strictly liable in tort only for products which have latent defects. However, they have not called to our attention, nor has our independent research disclosed, any reported decisions in this state which have made a distinction between latent and patent defects in applying the doctrine of strict liability. It is true that, as defendants note, the great majority of reported decisions dealing with products liability have involved defects classifiable as latent. But none of these cases, although quoting the language found in the second excerpt from *Greenman, limit* this type of liability to hidden defects.

"Indeed, we believe that if a latent-patent distinction ever had any vitality, it was laid to rest in *Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 473-474: 'Defendant contends that the danger of being struck by the paydozer was a patent peril and, therefore, that it had no duty to install safety devices to protect against an obvious danger. We do not agree. . . . [¶] [E]ven if the obviousness of the peril is conceded, the modern approach does not preclude liability solely because the danger is

---

[2]Plaintiff's knowledge of the defect is, of course, also relevant to the issue of assumption of risk, discussed *infra.*

obvious.' This language is found in our discussion of the manufacturer's liability for *negligence* in the design of the piece of construction equipment involved in that case. Immediately thereafter, however, we upheld the sufficiency of a second count based on the theory of strict liability. Our following discussion of the concept of strict liability, as well as the general tenor of our treatment of both bases of liability, strongly indicates our disavowal of any latent-patent distinction in the application of that theory. In upholding this basis of recovery, we made reference to the first *Greenman* excerpt and to section 402A of the Restatement Second of Torts,[8] neither of which requires proof by a plaintiff that he was unaware of a claimed defect. Additionally we cited with approval *Wright* v. *Massey-Harris, Incorporated* (1966) 68 Ill.App.2d 70 [215 N.E.2d 465], which allowed a cause of action in strict liability for a patent defect in design. (See also *Thompson* v. *Package Machinery Co.* (1971) 22 Cal.App.3d 188, 192-193 [99 Cal.Rptr. 281].)

"Furthermore, the policy underlying the doctrine of strict liability compels the conclusion that recovery should not be limited to cases involving latent defects. 'The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63.) Requiring the defect to be latent would severely limit the cases in which the financial burden would be shifted to the manufacturer. It would indeed be anomalous to allow a plaintiff to prove that a manufacturer was negligent in marketing an obviously defective product, but to preclude him from establishing the manufacturer's strict liability for doing the same thing. The result would be to immunize from strict liability manufacturers who callously ignore patent dangers in their products while subjecting to such liability those who innocently market products with latent defects."

When defendants' patency argument is eliminated, it is apparent that plaintiff's evidence amply supported a finding of defective product. ■ Since the decision of our Supreme Court in *Cronin* v. *J.B.E. Olson Corp.,* 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], there has

---

"[8]Section 402A provides: 'One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if [¶] (a) the seller is engaged in the business of selling such a product and [¶] (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.' "

been considerable uncertainty as to the definition of a defective product. In that case, the court struck down earlier holdings that a defective product was one which had ". . . defects in the manufacture or design of the article which caused it to be unreasonably dangerous and unsafe for its intended use . . . ." (8 Cal.3d at p. 128, fn. 8) (BAJI No. 9, as then in use.) In so doing, the court did not formulate a new definition, but rather acknowledged that none was provided. The court noted (8 Cal.3d at p. 134, fn. 16): "We recognize, of course, the difficulties inherent in giving content to the defectiveness standard. However, as Justice Traynor notes, 'there is now a cluster of useful precedents to supersede the confusing decisions based on indiscriminate invocation of sales and warranty law.' (Traynor, *supra,* 32 Tenn.L.Rev. 363, 373.)"

As a result, the Committee on Standard Jury Instructions, Civil, of the Superior Court of Los Angeles County, California, recast BAJI No. 9.00 to eliminate any attempt at definition of a defect and simply left it up to the jury to decide whether the condition which caused injury to the plaintiff when the article was used in a manner "reasonably foreseeable by the defendant" was a defect.[3]

Though there has been no appellate decision subsequent to *Cronin* approving a comprehensive instruction defining a product defect, certain aspects of the problem have been dealt with. In *Henderson v. Harnischfeger Corp.,* 12 Cal.3d 663, 668, fn. 3 [117 Cal.Rptr. 1, 527 P.2d 353], the instruction at issue stated as follows: " '*The defendant manufacturer of a product is not required under the law so to create and deliver its product as to make it accident proof; . . .*' " (Italics in original.) In holding that this instruction was not a misstatement of the law and was not confusing in its context, the court said (12 Cal.3d at p. 676): "The 'accident-proof' language, here challenged, although not a model of clarity, simply attempts to convey the concept that a product need not be free from all risk of harm; in other words, it expresses the view that a product need not be found defective simply because an accident has occurred. Following the expression of that concept, the instruction directs the attention of the jury to the elements which must be proved in a products

---

[3]BAJI No. 9.00 (1972 Revision) reads as follows:
"PRODUCTS LIABILITY—STRICT LIABILITY
IN TORT
"The _____ of an article is [liable] [subject to liability] for injuries proximately caused by a defect in the article which existed when the article left possession of the defendant[s], provided that the injury resulted from a use of the article that was reasonably foreseeable by the defendant[s]."

liability action. In the context of the entire instruction, we do not believe that the 'accident-proof' language would be regarded as a separate basis of nonliability; in fact, a product defect may or may not exist even though the product fails to be accident proof. We regard the 'accident-proof' language as an attempt to delineate the outer limits of legal responsibility in a products liability action. Unlike the so-called unavoidable accident instruction in *Butigan,* it does not appear to us that the challenged language, in the context of the entire instruction, would be confusing to a jury in this particular case. We, of course, cannot and do not assess its potential for confusion in the context of another instruction."

In *Self* v. *General Motors Corp.,* 42 Cal.App.3d 1 [116 Cal.Rptr. 575], this court noted the difficulty of precise definition of what constitutes a defective design. It said (42 Cal.App.3d at p. 6): "The foregoing testimony was sufficient to make a prima facie case in support of plaintiff's claim that the station wagon had been defectively designed. While the word 'defect' is not capable of precise definition in all cases (*Culpepper* v. *Volkswagen of America, Inc.,* 33 Cal.App.3d 510, 517 [109 Cal.Rptr. 110]) and while defective design is an amorphous and elusive concept once we have progressed beyond the idea of fitness for intended use, *its contours certainly include the notion of excessive preventable danger.* When an automobile's fuel tank has been located in a position relatively more hazardous than others, when the added hazard of its location has been recognized by the industry, when the danger is well-known to the designers, and when the tank could have been readily relocated in a safer position, a jury could conclude that the location of the fuel tank made the design of the automobile defective. On the subject of defective design the jury was presented with the experience, opinions, and reasons of plaintiff's experts, who testified one way, and the experience, opinions, and reasons of General Motors' expert, who testified the other way. It was the jury's responsibility to evaluate this evidence and draw its own conclusions. (*Donahue* v. *United Artists Corp.,* 2 Cal.App.3d 794, 803 [83 Cal.Rptr. 131].)" (Italics added.)

In *Self,* the court also discussed the argument of defendant in that case (General Motors) that "a design is defective only if it results in a product which is unsafe for its intended use" (*id.*) which does not include being "used as a stationery target for another vehicle . . ." (*id.*). In response to this argument, the court said (42 Cal.App.3d at pp. 6-7):

"This argument of General Motors follows a logical course, but its premise has been repudiated by the Supreme Court in *Cronin* v. *J.B.E. Olson Corp.,* 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]: '[The] argument that the van was built only for "normal" driving is unavailing. We agree that strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable. Although a collision may not be the "normal" or intended use of a motor vehicle, vehicle manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products. (*Passwaters* v. *General Motors Corporation* (8th Cir. 1972) 454 F.2d 1270, 1276; *Larsen* v. *General Motors Corporation* (8th Cir. 1968) 391 F.2d 495, 501-503; 80 Harv.L.Rev. 688, 689 (1967); contra, *Evans* v. *General Motors Corporation* (7th Cir. 1966) 359 F.2d 822, 825, cert. den., 385 U.S. 836 [17 L.Ed.2d 70, 87 S.Ct. 83].) The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use.' A motor vehicle manufacturer is required to foresee that as an incident of normal operation in the environment in which his product will be used accidents will occur, including high-speed collisions between vehicles. Because of this possibility he is required to design his vehicle to minimize unreasonable risks of injury and death. From this duty it follows that a motor vehicle manufacturer must take into account the possibility of high-speed collisions when it selects a location for the fuel tank in the vehicle. (See *Culpepper* v. *Volkswagen of America, Inc.,* 33 Cal.App.3d 510, 518 [109 Cal.Rptr. 110]; *Mickle* v. *Blackmon* (1969) 252 S.C. 202 [166 S.E.2d 173, 42 A.L.R.3d 525], and Annot. 560, 571-572.)

"Stated more generally, the law now requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse. The manufacturer must evaluate the crashworthiness of his product and take such steps as may be reasonable and practicable to forestall particular crash injuries and mitigate the seriousness of others. (*Cronin* v. *J. B. E. Olson Corp.,* 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Pike* v. *Frank G. Hough Co.,* 2 Cal.3d 465, 473-474 [85 Cal.Rptr. 629, 467 P.2d 229]; *Thomas* v. *General Motors Corp.,* 13 Cal.App.3d 81, 89 [91 Cal.Rptr. 301].) We recognize the impossibility of making a product foolproof or failsafe, and we appreciate the need to balance one consideration against another in designing a complicated product so as to achieve reasonable and practical safety under a multitude of varying conditions. We are also

well aware that prosecution of a lawsuit is a poor way to design a motor vehicle, for the suit will almost invariably emphasize a single aspect of design to the total exclusion of all others."

The foregoing authorities give us no comprehensive definition of a defective product or defective design. What they do teach, however, is that any product so designed that it causes injury when used or misused in a foreseeable fashion is defective if the design feature which caused the injury created a danger which was readily preventable through the employment of existing technology at a cost consonant with the economical use of the product.

■ The testimony of plaintiff's expert thus clearly supported a finding of defective design. His expert opinion was (1) that the absence of a head restraint exposed the occupant of the LUV in a low-speed rear-end collision to cranial impact some 16 times that which would result if head restraints were provided, (2) that the head restraints were an acceptable means of eliminating this hazard easily adaptable for use in the vehicle, and (3) that the cost of installation of such restraints was insignificant in relation to the cost of the vehicle. By any standard, his testimony supported a finding of design defect.

*There Was Substantial Evidence of Causal Connection*
*Between the Defect and Plaintiff's Injury*

■ Defendants' argument that there was no showing "that but for the absence of a head rest or head restraint" the injury to plaintiff would not have occurred overlooks the requirement that this court indulge "all inferences from the evidence which can reasonably be drawn which are favorable to the appellant." The evidence established that even without a head restraint, the impact to plaintiff's skull was relatively minor. Not even the usual "bump" was discernible. The jury was certainly entitled to infer that if the magnitude of the impact had been reduced to one-sixteenth of that experienced by plaintiff, even a person of his susceptibility would not have been injured or, in any event, the degree of his injury would have been substantially reduced. The requisite causal connection could well have been found by the jury.

*Assumption of Risk Was Not Established*
*as a Matter of Law*

■ The defense of assumption of risk in products liability cases was most recently defined by our Supreme Court in *Luque* v. *McLean, supra,*

8 Cal.3d 136, 145-146, where the court said: "Ordinary contributory negligence does not bar recovery in a strict liability action. 'The only form of plaintiff's negligence that is a defense to strict liability is that which consists in *voluntarily and unreasonably proceeding to encounter a known danger,* more commonly referred to as assumption of risk. For such a defense to arise, the user or consumer must become aware of the defect and danger and still proceed unreasonably to make use of the product.' (Italics added.) *(Barth* v. *B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 243 [71 Cal.Rptr. 306]; see also *Ruiz* v. *Minnesota Mining & Mfg. Co.* (1971) 15 Cal.App.3d 462, 470 [93 Cal.Rptr. 270]; Prosser, *Strict Liability to the Consumer in California* (1966) 18 Hastings L.J. 9, 48-50.) However, the defendant, not the plaintiff, has the burden of establishing such a defense *(Vierra* v. *Fifth Avenue Rental Service* (1963) 60 Cal.2d 266, 270 [32 Cal.Rptr. 193, 383 P.2d 777]; Prosser, Law of Torts (4th ed. 1971) p. 455). [Fn. omitted.]"

In the context of assumption of risk, awareness of the danger means ". . . actual knowledge of the particular danger and appreciation of the magnitude of the risk involved . . . ." *(Fuller* v. *State of California,* 51 Cal.App.3d 926, 940 [125 Cal.Rptr. 586]; see also *Vierra* v. *Fifth Avenue Rental Service,* 60 Cal.2d 266, 271 [32 Cal.Rptr. 193, 383 P.2d 777].)

The trial in this case occurred after the decision in *Li* v. *Yellow Cab Co.,* 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226], adopting comparative negligence. A question, therefore, exists as to the applicability of the defense of assumption of risk as a complete defense. In *Li,* the court discussed at length the effect of the comparative negligence doctrine upon the affirmative defense of assumption of risk in negligence cases. The pertinent portion of this discussion is as follows (13 Cal.3d at pp. 824-825): "As for assumption of risk, we have recognized in this state that this defense overlaps that of contributory negligence to some extent and in fact is made up of at least two distinct defenses. 'To simplify greatly, it has been observed . . . that in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . . Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would not involve contributory negligence,

but rather a reduction of defendant's duty of care.' (*Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 245-246 [53 Cal.Rptr. 545, 418 P.2d 153]; see also *Fonseca* v. *County of Orange* (1972) 28 Cal.App.3d 361, 368-369 [104 Cal.Rptr. 566]; see generally, 4 Witkin, Summary of Cal. Law, Torts, § 723, pp. 3013-3014; 2 Harper & James, The Law of Torts, *supra*, § 21.1, pp. 1162-1168; cf. Prosser, Torts, *supra*, § 68, pp. 439-441.) We think it clear that the adoption of a system of comparative negligence should entail the merger of the defense of assumption of risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence. (See generally, Schwartz, *supra*, ch. 9, pp. 153-175.)"

The kind of assumption of risk which *Luque* held applicable as a defense in products liability cases is closely related to that form of assumption of risk which the court characterized as "no more than a variant of contributory negligence." However, if this evaluation is correct, the conclusion does not necessarily follow that it has been merged into the "general scheme of assessment of liability in proportion to fault." As our Supreme Court noted in *Li*, the system adopted is one "under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault.[6a] "(13 Cal.3d at p. 813.) Footnote 6a explains (*id.*): "In employing the generic term 'fault' throughout this opinion we follow a usage common to the literature on the subject of comparative negligence. *In all cases, however, we intend the term to import nothing more than 'negligence'* in the accepted legal sense." (Italics added.)

Comparative negligence, therefore, as adopted in *Li*, entails a comparison of the respective negligence of the plaintiff on the one hand and of the defendant on the other. Strict liability for defective products is not based upon defendant's negligence. There may be, therefore, no negligence of the defendant to compare with that of plaintiff. It thus seems doubtful that *Li* has superseded *Luque* in strict liability cases. In *Horn* v. *General Motors Corp.*, 17 Cal.3d 359 [131 Cal.Rptr. 78, 551 P.2d 398], the majority of the court applies *Luque* in affirming a pre-*Li* judgment, saying: "Under these circumstances we find no compelling reason to apply the rule of comparative negligence to this case which was tried long before our decision in *Li* and in which on this appeal the issue of comparative negligence was neither briefed nor argued." (17 Cal.3d at p. 370, fn. 2.) In the dissent by Justice Clark, in which Justice McComb

concurs, the court is urged to expand comparative negligence to include "comparative fault" to "reduce damages" in strict liability cases. The dissent points out, "[t]his being strict liability, not negligence, a party attempting to raise the *Li* principle would be technically and practically incorrect in urging comparative negligence" (17 Cal.3d at p. 378, fn. 5) and that until the court "ultimately concludes that comparative fault is applicable to strict liability," (*id.,* p. 379, fn. 5) reversals of trial judges who "anticipated a contrary result" (to that ultimately reached) will occur.

In the absence of further enlightenment from our Supreme Court, we must assume that the narrowly circumscribed defense of "assumption of risk" in actions to impose strict liability for defective products recognized in *Luque* v. *McLean, supra,* may still be viable.[4]

■ In the course of presenting his case, plaintiff gave testimony which would have supported a verdict in favor of defendants on their defense of assumption of risk. That is not to say, however, that such evidence would require such a finding. Defendants had the burden of proof with respect to the defense of assumption of risk. (*Luque* v. *McLean,* 8 Cal.3d at pp. 145-146.) Plaintiff's testimony established beyond question his awareness of the defect. Further, it showed his appreciation that there was a risk or danger of injury from his head striking the rear window of the cab. Plaintiff testified, however, that he did not fully understand the magnitude of this risk; it did not occur to him that his head would impact the window as the result of a five m.p.h. rear-end collision. Such low-speed collisions are, of course, the most common form of automobile accidents. If the jury believed plaintiff's testimony, it could legitimately conclude that he did not understand the magnitude of the risk.

Further, plaintiff's testimony with respect to the reasonableness of his assumption of the risk was such that the jury might legitimately have found in his favor on this issue as well. He did not discover the defect until after he had purchased the vehicle. He made extensive efforts to obtain head rests but was unable to do so. He considered designing his own, but he was without experience or knowledge in either the design or construction of them. Under the circumstances, a jury finding that his assumption of the risk was not unreasonable would be fully supported.

---

[4]Of course, if a doctrine of comparative fault is held applicable to strict liability, the reversal of the nonsuit in this case would be required since plaintiff's fault would only serve to reduce, not eliminate, the recovery.

*Disposition*

The judgment in favor of defendants is reversed and remanded for further proceedings consistent with the views expressed above.

Cobey, Acting P. J., and Allport, J., concurred.