[No. B077874. Second Dist., Div. Four. Oct. 11, 1996]

ADAM KETCHUM, a Minor, etc., et al., Plaintiffs and Respondents, v. HYUNDAI MOTOR COMPANY et al., Defendants and Appellants; OFFSHORE CRANE COMPANY, INC., et al., Respondents.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III.

COUNSEL

Hillsinger & Costanzo, Darrell A. Forgey, William S. Hart, McCutchen, Doyle, Brown & Enersen, David M. Heilbron, Leslie G. Landau and M. Russell Wofford, Jr., for Defendants and Appellants.

Robinson, Phillips & Calcagnie, Mark P. Robinson, Jr., Kevin F. Calcagnie, Esner, Zakheim & Higa, Rosalyn S. Zakheim, Esner, Higa & Chang and Stuart B. Esner for Plaintiffs and Respondents.

Mower, Koeller, Nebeker, Carlson & Haluck, Jon R. Mower and Ellen Hunter for Respondents.

**OPINION**

**EPSTEIN, Acting P. J.**—Hyundai Motor Company and Hyundai Motor America (hereafter Hyundai or appellant) appeal from a $14 million judgment against them for injuries sustained by nine-year-old Adam Ketchum while a passenger in a Hyundai automobile. Appellant contends the court's answer to a jury question essentially directed a verdict on the issues of causation and liability; that improper comments by the court clerk and bailiff pressured the jury to reach a decision; that multiple hearsay in the medical records should not have been admitted; that respondents' theory regarding the two-point seat belt was preempted by the National Traffic and Motor Vehicle Safety Act; that it was improper to use the consumer expectation test for defect; and that the settlement with another party, Offshore Crane Company, Inc. and its employee (collectively Offshore), should not have been found to be in good faith and that none of it should have been reallocated toward noneconomic damages.

In the published portion of the opinion, we conclude that respondents' claim based on defective safety restraints is not preempted by the federal

safety act. In the unpublished portion of the opinion, we conclude that the trial court erred in its response to the jury's questions, and that this error requires reversal of the judgment against Hyundai. We also conclude that the good faith settlement order should be upheld.

### FACTUAL AND PROCEDURAL SUMMARY

On September 12, 1990, Dean Engle, an employee of Offshore, was driving Offshore's 120,000-pound truck and trailer from Seal Beach to Bakersfield. Engle was not licensed to drive the vehicle at night. As dusk approached, he parked the rig on what he believed to be a large shoulder. It was actually the entrance lane of the Del Amo on-ramp to the northbound I-605 freeway. Engle shut off the engine, turned on the hazard lights, and went to call his employer for instructions.

At approximately 8 p.m. that evening, Sandra Ketchum drove her 1988 Hyundai Excel onto the Del Amo on-ramp to the northbound I-605. Her nine-year-old son Adam was in the right front seat of the car. Ms. Ketchum accelerated to approximately 20 to 25 miles per hour and looked over her left shoulder to see if she could safely merge into traffic. She drove her Hyundai into the rear of the parked truck and trailer rig Engle had left on the ramp. The passenger side of the Hyundai smashed into the rig and rode under it. Adam suffered serious permanent brain damage. As a result, he is severely retarded, blind, unable to speak, partially paralyzed, confined to a wheelchair, and requires constant medical attention. He also suffered other injuries of a relatively minor nature—a circumstance that takes significance from the trial court's handling of jury questions, one of the issues on appeal.

Adam and his father, Robert Ketchum, Jr., filed an action against Offshore and its driver on February 22, 1991. In May 1991, they filed an amended complaint naming Hyundai as a defendant, alleging that the Hyundai Excel was not crashworthy. Hyundai was not served with the complaint until the next year.

Also in May 1991, Offshore settled with Adam and his mother for $1.2 million, of which $1 million was paid on behalf of Adam and $200,000 to his mother. As a result, on July 15, 1991, Adam and his father dismissed the complaint against Offshore. Hyundai was served with the first amended complaint nine months later, on April 14, 1992.

On August 24, 1992, Hyundai filed a cross-complaint against Offshore, which was not served until January 19, 1993. Trial, originally set for January

7, 1993, was continued at Hyundai's request until April 19, 1993. On February 18, 1993, Offshore moved to strike Hyundai's cross-complaint, or, in the alternative, for a continuance of the trial date. In its moving papers, Offshore stated its intent to move within 45 days for a determination that its settlement with Adam was made in good faith. Twelve days later, Hyundai filed a request for dismissal of its cross-complaint against Offshore.

On Friday, April 9, 1993, 10 days before trial, Offshore notified Hyundai that it intended to seek an order shortening time for a hearing on its motion for a good faith finding. The order shortening time was granted on Monday, April 12; Hyundai's response was due on April 15; and the hearing was set for April 16. Hyundai's request for a continuance of the hearing was denied, and the settlement was found to be in good faith.

The court denied Hyundai's motion to bifurcate the trial on damages from the trial on liability, and the case proceeded to trial. There were two basic theories as to the cause of Adam Ketchum's brain damage. Respondents presented evidence and argued that without a lap belt, Adam "submarined" down on his seat after the impact, with the shoulder belt "loading" across his neck. This obstructed his airway, resulting in anoxia—a lack of oxygen to the brain—which caused permanent brain damage. Appellant's theory was that Adam's permanent brain damage was caused by traumatic head injury, not by anoxia. Appellant acknowledged that there was evidence of secondary anoxia, when the swelling caused by the trauma restricted the blood flow in the brain, but distinguished that from respondents' theory of anoxia caused by the shoulder belt. Respondents argued in rebuttal that Adam might have suffered a head blow and immediately thereafter suffered anoxia caused by the shoulder belt pressing against his neck.

The jury initially deadlocked on certain of the special verdict questions, but ultimately reached a nine-to-three verdict for Adam and his father. The jury awarded $15 million to Adam, and $40,000 to his father. It allocated liability 35 percent to Hyundai, 50 percent to Offshore, and 15 percent to Adam's mother. Hyundai's motion for new trial was denied. The court reallocated the Offshore settlement between economic and noneconomic damages in the same proportion as the damages awarded by the jury. Hyundai appeals from the judgment and from the good faith finding.

DISCUSSION

I

*"Directed Verdict" on Causation**

. . . . . . . . . . . . . . . . . . . . . . . . .

II

*Preemption*

Appellant claims the judgment should not only be reversed for retrial, but that judgment should be entered in its favor. According to appellant, respondents' design defect claim based on seat belt design never should have reached the jury because it is preempted by the National Traffic and Motor Vehicle Safety Act (15 U.S.C. § 1381 et seq., hereafter Safety Act)[3] and Federal Motor Vehicle Safety Standard 208 (49 C.F.R. § 571.208 (1995), hereafter FMVSS 208). Courts are divided on this question, in California (see *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 540-541 [132 Cal.Rptr. 605] [headrest case; no preemption found]; *Nissan Motor Corp.* v. *Superior Court* (1989) 212 Cal.App.3d 980, 982-983 [261 Cal.Rptr. 80] [no airbag case; preemption found]), and across the country (see, e.g., *Perry* v. *Mercedes Benz of North American, Inc.* (5th Cir. 1992) 957 F.2d 1257 [39 A.L.R.5th 861] [defective airbag case; no preemption found]; *Wilson* v. *Pleasant* (Ind. 1995) 660 N.E.2d 327 [no airbag case; no preemption found]; *Taylor* v. *General Motors Corp.* (11th Cir. 1989) 875 F.2d 816 [no airbag case; implied preemption found]; *Dykema* v. *Volkswagenwerk AG* (1994) 189 Wis.2d 206 [525 N.W.2d 754] [no pelvic restraint case; preemption found]).

While this case was pending before us, the United States Supreme Court decided *Medtronic, Inc.* v. *Lohr* (1996) 518 U.S. __ [135 L.Ed.2d 700, 116 S. Ct. 2240], a case addressing whether the federal Medical Device Amendments of 1976 (the MDA) preempts state defective design claims. We gave

*See footnote, *ante*, page 1672.
[3]The Safety Act was revised and moved to 49 United States Code section 30101 et seq. (Pub.L. No. 103-272 (July 5, 1994) § 1(e), 108 Stat. 941.) In making this change, Congress intended to "restate in comprehensive form, without substantive change, certain general and permanent laws related to transportation and to enact those laws as subtitles II, III, and V-X of title 49, United States Code, and to make other technical improvements in the Code." (H.R.Rep. No. 103-180, 1994 U.S. Code Cong. & Admin. News, p. 818.) Since no substantive change was intended by the enactment of the new provisions, we attach no significance to the slight changes in language. We use the former code sections in our discussion; unless otherwise noted, statutory references in this portion of the discussion are to 15 United States Code.

the parties an opportunity to submit additional briefing on the effect of the *Medtronic* case on the preemption issue in our case. As the parties have noted, the statutory scheme in *Medtronic* differs significantly from the Safety Act, and the court was widely divided in its interpretation of the preemption language in the MDA. Nevertheless, we find guidance in the court's discussion of the basic principles of preemption.

■ In all preemption cases, we start with the assumption that federal statutes do not supersede the historic police powers of the states unless it is the clear and manifest purpose of Congress to do so. (*Medtronic, Inc.* v. *Lohr, supra,* 518 U.S. __, __ [135 L.Ed.2d 700, 715-716, 116 S.Ct. 2240, 2250].) There is a presumption against the preemption of state police power regulations, which supports a narrow interpretation both as to the existence of preemption and as to the scope of the preemption. (*Ibid.*) " '[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case. [Citations.] As a result, any understanding of the scope of a pre-emption statute must rest primarily on 'a fair understanding of congressional purpose.' [Citation.] Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it. [Citation.] Also relevant, however, is the 'structure and purpose of the statute as a whole,' [citation], as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (*Id.* at pp. __-__ [135 L.Ed.2d at p. 716, 116 S.Ct. at pp. 2250-2251].)

■ The safety standard at issue in this case is FMVSS 208, which offered automobile manufacturers a choice of three separate options for occupant crash protection in passenger cars: (1) passive restraints for all crashes; (2) passive restraints for head-on crashes plus manual belts; or (3) manual three-point seat belts. (49 C.F.R. § 571.208 (1995), S4.1.3.2.1, S4.1.3.1, S4.1.2.1, S4.1.2.2, S4.1.2.3.) If a manufacturer selected the second option, it could install "a seat belt assembly that requires no action by vehicle occupants . . . to meet the crash protection requirements of any option under S4. and in place of any seat belt assembly otherwise required by that option." (49 C.F.R. § 571.208, S4.5.3.) This modified version of option 2, a two-point automatic shoulder belt system without a manual lap belt, is the option selected by appellant for the 1988 Hyundai Excel.

Appellant argues that if, as respondents' claim, the system should have included a lap belt, the requirement amounts to a common law safety standard that is not identical to the federal standard as to the same aspect of

performance or item of equipment. If that is so, the argument proceeds, the standard is preempted by section 1392(d). That section provides: "Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard."

"Motor vehicle safety standards" are defined in the Safety Act as "a *minimum* standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." (§ 1391(2), italics added.)

As explained in the Senate Report on the bill, the standards "are expected to be performance standards, specifying the required *minimum* safe performance of vehicles but not the manner in which the manufacturer is to achieve the specified performance (sec. 101(b)). Manufacturers and parts suppliers will thus be free to compete in developing and selecting devices and structures that can *meet or surpass* the performance standard." (Sen.Rep. No. 1301, 89th Cong., 2d Sess., pp. 2713-2714 (1966), italics added.)

Both section 1391(2) and the Senate Report reflect Congress's desire to specify only the minimum standards for motor vehicle safety, with the expectation that market factors would encourage manufacturers to develop higher safety performance. That intent is not served by preempting common law claims of negligence, since a manufacturer would not have the risk of tort liability to encourage development of safety features. It is furthered, however, by the express language of the savings clause (§ 1397(k)) which Congress included in the Safety Act. That section provides: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." There is nothing ambiguous or unclear about this provision. Liability under common law is *not* preempted.

Congress's intent to preserve common law claims is expressly described in the Senate Report, in the section explaining the effect of the Safety Act on state law: "The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced,

but that they be uniform throughout the country. At the same time, the committee believes that the States should be free to adopt standards identical to the Federal standards, which apply only to the first sale of a new vehicle, so that the States may play a significant role in the vehicle safety field by applying and enforcing standards over the life of the car. Accordingly, State standards are preempted only if they differ from Federal standards applicable to the particular aspect of the vehicle or item of vehicle equipment (sec. 104). [¶] The States are also permitted to set more stringent requirements for purposes of their own procurement. *Moreover, the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law.*" (Sen.Rep. No. 1301, 89th Cong., 2d Sess., p. 2720 (1966), italics added.)[4]

In the preemption clause, Congress precludes the states from establishing or continuing any motor vehicle "safety standard applicable to the same aspect of performance." (§ 1392(d).) There is no preclusion of "liability under common law." The savings clause (§ 1397(k)) provides that compliance with a "safety standard" issued under the Safety Act does not exempt a person from "liability under common law." Congress clearly distinguished between motor vehicle safety standards, which are preempted, and common law standards for liability, which are not. This language unambiguously expresses the intent of Congress to preserve common law liability actions.

Appellant points out that the Supreme Court in *Medtronic* relied solely on the language of the preemption clause in the MDA and did not even mention the general savings clause in 21 United States Code section 360h(d). It argues we should do the same in this case. What appellant fails to mention, however, is that the savings clause in the MDA (21 U.S.C. § 360h(d)) applies only to compliance with an order by the Secretary of the Department of Health and Human Services requiring repair, replacement, refund or recall of a device that presents an unreasonable risk of harm. That portion of the MDA was not in issue in *Medtronic*, so the savings clause was not applicable and the court had no reason to discuss it.

Given the language of the Safety Act, the clear expression of legislative intent, and the strong presumption against preemption, we conclude that common law claims such as those presented in this case are not preempted by the Safety Act.

---

[4]For a more thorough discussion of the legislative history of the Safety Act, see Chadwell, *Automotive Passive Restraint Claims Post-Cipollone: An End to the Federal Preemption Defense* (1994) 46 Baylor L.Rev. 141.

## III

### *Good Faith Settlement\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed. The determination that the settlement with Offshore was made in good faith is affirmed. The parties are to bear their own costs on appeal.

Hastings, J., and Rubin, J.,† concurred.

---

\*See footnote, *ante*, page 1672.

†Judge of the Municipal Court for the Santa Monica Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.