[Civ. No. 53627. Second Dist., Div. Five. Mar. 30, 1979.]

DAVID MONTGOMERY TITUS, a Minor, etc.,
Plaintiff and Appellant, v.
BETHLEHEM STEEL CORPORATION, Defendant and Respondent.

COUNSEL

Archbald & Spray and J. William McLafferty, Jr., for Plaintiff and Appellant.

Lillick, McHose & Charles, Kenneth R. Chiate and Sidney K. Kanazawa for Defendant and Respondent.

## OPINION

**HASTINGS, J.**—In this appeal plaintiff David Montgomery Titus, a minor, by his guardian ad litem, Denise Marie Cuthbert, seeks reversal of a judgment rendered on November 29, 1977, in favor of defendant Bethlehem Steel Corporation.

On September 6, 1971, nine-year-old David Montgomery Titus (Monty) was severely and permanently injured on an oil well pumping unit. He and his 11-year-old friend, Ian Bogue, had gone to their neighbors' property in order to "ride" on an oil well pumping unit located there. Ian had played on such units previously, but Monty had not. Although there was another pump located closer to their homes, they had not played on that one since they wished to avoid observation by their parents. On entering the neighboring property owned by Lance and Alice Fletcher,[1] they approached an area on which several pumps were operating. Ian climbed onto one unit and rode the walking beam; Monty watched him. Then the two boys went over to a smaller pump located close by. They both climbed onto that pumping unit and began to ride on the wrist pin of the crank, holding on to the pitman arm for support. Monty's foot slipped and he found himself falling into the crank area of the unit where he was crushed by the revolving counterweight. He testified at trial that he heard his bones cracking and then lost consciousness. His friend Ian dragged him from the unit to the ground and then ran for help.

At trial, Monty's father testified that he had previously warned some of his five children of the dangers attributed to riding on oil pumps, but "it would be entirely possible that [he] could have missed Monty at the time." Monty's mother testified that she did not remember ever warning Monty about playing on oil pumps because she recognized such activity as dangerous and thought her children did also. Monty testified that he had been warned previously about playing on a somewhat different type of pump when he was found riding on a pump cable; however, the danger he had been warned against was one of falling to the ground a distance of about three feet, not the danger of falling into the moving parts of heavy machinery. From the testimony of experts in the oil industry, it appeared that children frequently played on oil pumps. Lance Fletcher, the neighbor on whose property the accident occurred, testified that he had been aware that children frequently came onto his property, that he had talked to them many times and that he had never chased them away.

---

[1]Lance and Alice Fletcher and G. E. Ramseyer, owner of the oil pumping unit, were also sued but settled with plaintiff and were dismissed from the suit.

The oil pumping unit on which Monty was injured was manufactured in the late 1940s by Bethlehem Supply Corporation of Tulsa; on or about August 16, 1951, it was shipped to Bethlehem Supply Company of California, a company which was dissolved in 1959. Both companies were subsidiaries of Bethlehem Steel Corporation. Apparently the unit was first sold by Bethlehem Supply Co. of California to an unidentified party in 1951. At trial, testimony revealed that during the period of the pump's manufacture and initial sale (from 1951 to 1959), it was the custom of Bethlehem Supply Co. of Tulsa to manufacture its pumps without a crank guard, a safety device commonly used to protect users from the machine's moving parts; however, before sale, Bethlehem Supply Co. of California did offer such a crank guard to potential customers on an optional basis. Approximately 75 percent of their pump buyers bought the optional crank guard. Among those who did not, some fabricated their own guards as they deemed necessary.

No definitive records were produced at trial regarding the history of the pump in question after the time it was shipped to Bethlehem Supply Co. of California in 1951 until the time when it reappeared on the Fletcher property in 1964 as part of an oil pumping project. There were no records of its initial sale which could establish whether or not it was sold with the optional crank guard safety device. In 1964, the unit was purchased and placed on the Fletcher property in conjunction with an oil lease project undertaken by two working partners, Emery and Langs, and by the project's financier, Dr. G. E. Ramseyer. Dr. Ramseyer testified that when he first saw the pump on the Fletcher property, it appeared to be new. In 1968, Dr. Ramseyer took over the lease, which had not yet been a successful financial venture; soon afterwards, he abandoned the project and closed down the pumps. The electrical service was never disconnected, and on several occasions prior to Monty's accident, the machines were found running.

At trial, there was conflicting evidence as to the presence of crank guard material found on the installation site. Dr. Ramseyer, Mr. Fletcher, Mr. Ishkanian (an employee of the State of California Division of Industrial Safety), and Monty's father all testified that they had been on the site and had never noticed a crank guard or crank guard material which could be associated with the Bethlehem pump. The defense produced photographs of materials found on the Fletcher property in December of 1973 about 50 or 60 feet from the pump. These materials were identified by Mr. Briley, a former employee of Bethlehem Supply Co. of California, as materials used in crank guards formerly manufac-

tured by them. The unique construction of Bethlehem guards enabled Mr. Briley to make his identification. Testimony by Lance Fletcher, a 55-year veteran of the oil industry, however, indicated others also used similar construction in fabricating crank guards (angle iron, expanded metal, hinges). Also, it was revealed that more than one Bethlehem pump was located in the general area where the photograph had been taken. No evidence was produced which definitely linked the crank guard materials to the specific pump on which the accident had occurred.

Plaintiff procured the testimony of two oil field safety engineers and a consulting engineer knowledgeable in the area of industrial safety. Each of these expert witnesses agreed that an oil pumping unit which operates without a crank guard to protect persons from moving parts is a very dangerous instrumentality.

Jury instructions given prior to jury deliberation included instructions on strict products liability in tort, and stated that the manufacturer of an article is liable for foreseeable injuries caused by a defect in such article if the defect existed when the article left the manufacturer.[2] Plaintiff, whose sole cause of action was one of strict manufacturer liability, based his theory of liability on the assumption that a product designed without adequate safety features may be considered defective. He requested the court to include an instruction defining the meaning of "product defect," offering several instructions to fill this request.[3] Each of plaintiff's

---

[2]The following two instructions were given:

1. "The manufacturer of an article is liable for injuries legally caused by a defect in the article which existed when the article left possession of the defendant, provided that the injury resulted from a use of the article that was reasonably foreseeable by the defendant."

2. "Defendant BETHLEHEM STEEL CORPORATION is not required under the law so to create and deliver its product as to make it accident-proof; however, BETHLEHEM STEEL CORPORATION is liable to plaintiff DAVID MONTGOMERY TITUS if plaintiff satisfies his burden of establishing by a preponderance of the evidence all of the facts necessary to prove each of the following issues:

"(1) That defendant BETHLEHEM STEEL CORPORATION was the manufacturer of the oil pumping unit on which plaintiff was injured;

"(2) That the oil pumping unit on which plaintiff was injured was defective;

"(3) That the defect existed when the article left the possession of defendant BETHLEHEM STEEL CORPORATION;

"(4) That the article was used in a manner reasonably foreseeable by defendant BETHLEHEM STEEL CORPORATION; and

"(5) That the defect was a legal cause of injury to plaintiff. . . ." (The balance of the instruction, on assumption of risk, is omitted.)

[3]Two of plaintiff's requested special jury instructions were as follows:

"A product is defective if it is made with inadequate materials, if it does not contain reasonable safety features, if it is poorly manufactured, or if it contains concealed dangers not made known to potential users by an adequate warning. Moreover, a failure to supply

requested instructions was refused. At defendant's request, the court did give an instruction on an assumption of the risk defense. By means of a special verdict,[4] the jury found the oil pumping unit was a nondefective product, thereby precluding a finding of strict liability against defendant.

■ Plaintiff's principal argument on appeal is that the trial court committed reversible error in refusing to include a jury instruction defining a "defective product." They were instructed that plaintiff had the burden of proof to establish that the oil pumping unit was defective, the defect existed when it left the possession of the defendant and the defect was the proximate cause of the injury from a use of the article that was reasonably foreseeable by the defendant (see instructions in fn. 2, *ante*). The words "defect" or "defective" are used four times, but the jury was left to its own device to determine their meaning. In finding the product was not defective, they could have based their decision on several interpretations which were inconsistent with plaintiff's meaning as spelled out in the requested instructions; for example, they could have

proper instructions for safe use of the product renders the product defective.

"A product may be defective if it does not include safety devices necessary to its reasonable safety. [¶] If the product in this case, that is, the oil well pumping unit, is one that is inherently dangerous in normal use and the manufacturer of that oil well pumping unit fails to incorporate adequate safety devices, the oil well pumping unit may be considered defective for purposes of strict liability."

[4]The special verdict supplied to the jury, and its answers thereto, were as follows:

"You are directed to return a special verdict by making findings on the following issues upon this form.

"Issue No. 1: Was the defendant, BETHLEHEM STEEL CORPORATION, the manufacturer of the oil pumping unit on which plaintiff was injured: Answer: Yes or No_____. ["Yes" was written in as the answer.]

"If you have answered Issue No. 1 "yes," then answer the next issue. If you have answered Issue No. 1 "no," do not proceed, but return to the courtroom.

"Issue No. 2: Was the oil pumping unit defective? Answer: Yes or No_____. ["No" was written in as the answer.]

"If you have answered Issue No. 2 "yes," then answer the next issue. If you have answered Issue No. 2 "no," do not proceed, but return to the courtroom.

"Issue No. 3: Did the defect exist in the oil pumping unit at the time it left the possession of the defendant? Answer: Yes or No_____.

"If you have answered Issue No. 3 "yes," then answer the next issue. If you have answered Issue No. 3 "no," then do not proceed, but return to the courtroom.

"Issue No. 4: Did the injury to the plaintiff result from a use of the oil pumping unit that was reasonably foreseeable by the defendant? Answer: Yes or No_____.

"If you have answered Issue No. 4 "yes," then answer the next issue. If you have answered Issue No. 4 "no," then do not proceed, but return to the courtroom.

"Issue No. 5: Was the defect a legal cause of injury to the plaintiff? Answer: Yes or No_____.

"If you have answered Issue No. 5 "yes," then answer the next issue. If you have answered Issue No. 5 "no," then do not proceed, but return to the courtroom.

"Issue No. 6: Did the plaintiff assume the risk of harm from use of the oil pumping unit? Answer: Yes or No_____."

believed "defective" meant that the pump was not performing properly or that it was poorly manufactured, two concepts not urged by plaintiff. But a third concept advanced by defendant could have been critical to plaintiff's case: there was substantial evidence to support plaintiff's theory that the designed pump without safety guards was defective and there was little evidence, if any, to contradict it. Defendant, however, throughout the trial and in final argument, maintained that it was custom and practice in the industry that manufacturers offered security guards as optional equipment. ■ This was error because custom and usage is not a defense to a cause of action based on strict liability. In *Foglio* v. *Western Auto Supply,* 56 Cal.App.3d 470, 477 [128 Cal.Rptr. 545], the court stated:

"Plaintiff also contends that the court erred in giving the following instruction on the effect to be given evidence of custom or practice in the trade or industry: 'Evidence as to whether or not the defendant conformed to a custom or practice that had grown up in a given business at the time the lawnmower was manufactured ought to be considered on the question whether or not the defendant exercised reasonable care in the design of the subject lawnmower. What weight should be given to such evidence is for you to decide.'

"Plaintiff's contention is valid. The quoted instruction is an adaptation of BAJI No. 3.16 which is designed for use where liability is predicated on negligence. In a strict liability case based on a defect in design, the issue is not whether defendant exercised reasonable care in designing the product. (*Cronin* v. *J. B. E. Olson Corp., supra,* 8 Cal.3d 121, 133-134 [104 Cal.Rptr. 433, 501 P.2d 1153].) The rendition of the quoted instruction was manifest error."

■ In view of the fact that the jury was permitted to consider this evidence, it is quite probable that they believed the pump was not defective without safety features if it was customary to sell the product without such equipment.[5] Just to counter this erroneous concept required

---

[5]That the term "defective" can include erroneous concepts is recognized in an article in 8 Sw.U.L.Rev. 109 entitled *Product Designs and Strict Tort Liability: Is There a Better Approach?* (1976) where the author Michael Hoenig states on pp. 136-137: "The intense struggle to articulate the meaning of defect in strict tort liability has now lasted over a decade. The period has been one of unhealthy uncertainty and confusion in products law. Courts continue to flounder while attempting to determine whether a product is in a defective condition . . . This difficulty carries over not only to matters of evidence and proof but also to the instructions to the jury. As a result, jurors may receive confusing and misleading instructions which are often a conglomerate of several different theories of liability."

the giving of one of plaintiff's requested instructions or a modification thereof.

Recent decisional law further supports plaintiff's argument. In *Barker* v. *Lull Engineering Co.*, 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443], the court, in clarifying portions of its opinion in *Cronin* v. *J. B. E. Olson Corp.*, 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], states beginning on page 417: ". . . we shall explain that our *Cronin* decision did not dictate that the term 'defect' be left undefined in jury instructions given in all product liability cases. [¶] As *Cronin* acknowledged, in the past decade and a half California courts have frequently recognized that the defectiveness concept defies a simple, uniform definition applicable to all sectors of the diverse product liability domain. Although in many instances—as when one machine in a million contains a cracked or broken part—the meaning of the term 'defect' will require little or no elaboration, in other instances, as when a product is claimed to be defective because of an unsafe design or an inadequate warning, the contours of the defect concept may not be self-evident. In such a case a trial judge may find it necessary to explain more fully to the jury the legal meaning of 'defect' or 'defective.' . . ." On page 427 of 20 Cal.3d the *Barker* opinion discusses plaintiff's burden and his right to a definition of "defect." It states: "In *Cronin,* we reaffirmed the basic formulation of strict tort liability doctrine set forth in *Greenman* [v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 (27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049)]: ' "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. . . ." ' [Citation.] We held in *Cronin* that a plaintiff satisfies his burden of proof under *Greenman,* in both a 'manufacturing defect' and 'design defect' context, when he proves the existence of a 'defect' and that such defect was a proximate cause of his injuries. [Citation.] In reaching this conclusion, however, *Cronin* did not purport to hold that the term 'defect' must remain undefined in all contexts [citation], and did not preclude a trial court from framing a definition of defect, appropriate to the circumstances of a particular case, to guide the jury as to the standard to be applied in determining whether a product is defective or not." In conclusion, *Barker* states (20 Cal.3d, p. 435): "We hold that a trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to

prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design."

■ It is well established that when a party requests special instructions in support of his theory of the case, he is entitled to have such instructions submitted to the jury if they are supported by the evidence and are in accord with applicable law.[6] (*Hasson* v. *Ford Motor Co.,* 19 Cal.3d 530, 543 [138 Cal.Rptr. 705, 564 P.2d 857]; *Fish* v. *Los Angeles Dodgers Baseball Club,* 56 Cal.App.3d 620, 633 [128 Cal.Rptr. 807]; *Hiner* v. *Hubbard,* 240 Cal.App.2d 63, 69 [49 Cal.Rptr. 157].) ■ Although *Barker* does not mandate that the trial court must give an instruction that a product is defective in design in *all* cases, we conclude for the reasons stated earlier in this opinion that some instruction to support plaintiff's theory was required.

The above conclusion brings us to our next consideration; namely, were there sufficient guidelines from existing case law at time of trial to enable the court to draft an appropriate instruction?

The answer is clearly in the affirmative.[7] In *Slayton* v. *Wright,* 271 Cal.App.2d 219, 237-238 [76 Cal.Rptr. 494], the court agreed that the following rule was applicable to those engaged in the business of selling: "[T]he Manufacturer of an article and the supplier who places it on the market for use under circumstances where they know, or should know, that such article will or may be used without the installation of a safety device when the same is necessary or prudent to have, are liable for injuries proximately caused by the absence of such device of which the user was not aware, provided the article was being used in a manner which was reasonably foreseeable by the manufacturer . . . ." In *Garcia*

---

[6]Apropos to the importance of an instruction to support a plaintiff's theory in a design defect case is a statement of Dean Page Keeton in *Product Liability and the Meaning of Defect* (1973) 5 St. Mary's L.J. 30, 31, where he said:. "[T]he difficulty is that no.content was given to the concept of [design] defect and this is vitally important *when a plaintiff's theory is that a product, although fabricated and constructed as it was intended to be,* subjected users or others to an inherent risk of harm that made the product defective." (Italics added.)

[7]In *Barker, supra,* 20 Cal.3d at page 429, the court commented: "Since the rendition of our decision in *Cronin,* a number of thoughtful Court of Appeal decisions have wrestled with the problem of devising a comprehensive definition of design defect in light of existing authorities. (See, e.g., *Hyman* v. *Gordon* (1973) 35 Cal.App.3d 769 [111 Cal.Rptr. 262]; *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1 [116 Cal.Rptr. 575]; *Baker* v. *Chrysler Corp., supra,* 55 Cal.App.3d 710 [127 Cal.Rptr. 745]; *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533 [132 Cal.Rptr. 605].) As these decisions demonstrate, the concept of defect raises considerably more difficulties in the design defect context than it does in the manufacturing or production defect context."

v. *Halsett*, 3 Cal.App.3d 319, 322, 326 [82 Cal.Rptr. 420] where the lack of an inexpensive and easily obtainable safety device for a washing machine resulted in a user's injury, the court found that the evidence was sufficient for a finding of defective product. Courts have frequently cited Justice Traynor's view that the deviation-from-the-norm test does not provide a solution for all cases. It may be over inclusive, or it may be under inclusive, and it has been suggested that liability might be imposed as to products whose norm is danger. (Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 367 et seq.; *Jiminez* v. *Sears, Roebuck & Co.*, 4 Cal.3d 379, 383 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]; *Culpepper* v. *Volkswagen of America, Inc.*, 33 Cal.App.3d 510, 517 [109 Cal.Rptr. 110].) Finally, in *Buccery* v. *General Motors Corp.*, 60 Cal.App.3d 533 [132 Cal.Rptr. 605], after summarizing prior decisions related to product defect, the court stated at page 547: "The foregoing authorities give us no comprehensive definition of a defective product or defective design. What they do teach, however, is that any product so designed that it causes injury when used or misused in a foreseeable fashion is defective if the design feature which caused the injury created a danger which was readily preventable through the employment of existing technology at a cost consonant with the economical use of the product." From these opinions it is evident that as of the time of trial, legal theory supported an instruction that a product may be found defective if it does not include a safety device necessary for its reasonable safety (first portion of plaintiff's requested special jury instruction, *supra.*)

It is true that some products which are inherently dangerous may lack safety devices because no adequate protection has yet been discovered.[8] However, in the present case, we are not faced with a dangerous product which is impossible or extremely impractical to improve. Instead, we have a product whose danger consisted of exposed moving parts. Plaintiff produced two expert witnesses from the oil industry who confirmed his position that adequate safety devices were often purchased and installed to protect foreseeable victims from such danger. Plaintiff's requested jury instructions, or appropriate modifications thereof, should have been given because without this guidance, the jury's response to special verdict question 2, "Was the oil pumping unit defective?" may well have been premised on one of the erroneous assumptions cited earlier. Although on

---

[8]Products such as knives and matches fall into this category. (See Traynor, *The Ways and Means of Defective Products and Strict Liability, supra,* 32 Tenn.L.Rev. 363, 366-367.) However, even in such cases, manufacturers have been required to make their products as safe as possible and to make use of adequate warnings. (*Midgley* v. *S.S. Kresge Co.*, 55 Cal.App.3d 67, 74 [127 Cal.Rptr. 217].)

retrial the evidence on custom and usage as it pertains to the optional sale of the safeguards will be inadmissible, to avoid other possible misinterpretations of the meaning "defect" or "defective product," we conclude plaintiff is entitled to an instruction that, based on the facts of this case, will appropriately instruct the jury.

It is possible that the crank guard was sold with the unit and this might have remedied the defect and absolved defendant. Special verdict issue No. 3, "Did that defect exist in the oil pumping unit at the time it left the possession of the defendant?" could possibly have been aimed at this question. This issue, however, which was in doubt because of the conflicting evidence, was not considered by the jury because plaintiff's requested instruction or modification thereof was not given and the jury was not required to reach this issue in view of its answer to question No. 2.

Plaintiff's second contention concerns the submission of a jury instruction on assumption of risk as a defense to a manufacturer's strict liability. We need not address plaintiff's claim that this instruction was unsupported by the evidence since the issue will now be considered on retrial and will be governed by the recent case of *Daly* v. *General Motors Corp.,* 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162], which abolishes assumption of risk as a separate defense in actions founded on strict product liability. Instead, following the course begun in *Li* v. *Yellow Cab Co.,* 13 Cal.3d 804, 824-825 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], the doctrine has merged into an assessment of comparative negligence.

The judgment is reversed.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied April 24, 1979, and respondent's petition for a hearing by the Supreme Court was denied July 27, 1979. Clark, J., was of the opinion that the petition should be granted.