[Civ. No. 26402. Fourth Dist., Div. One. Mar. 15, 1984.]

JAMES K. WIDSON, Plaintiff and Respondent, v.
INTERNATIONAL HARVESTER COMPANY, INC.,
Defendant, Cross-complainant and Appellant;
JAMES McDOWELL CORPORATION et al.,
Cross-defendants and Respondents.

Counsel

R. Reaves Elledge, Jr., Marcelle E. Mihails Gray, Cary, Ames & Frye and Seymour W. Croft for Defendant, Cross-complainant and Appellant.

Alan J. Ludecke, Steven R. Denton and Ludecke, McGrath & Denton for Plaintiff and Respondent.

William C. Pate, Gerard Smolin, Jr., Anthony P. Pascale Jennings, Engstrand & Henrikson, Philip D. Sharp and Shifflet, Sharp & Walters for Cross-defendants and Respondents.

Opinion

**STANIFORTH, J.**—Plaintiff James K. Widson was seriously injured in a job site accident when a payscraper (a massive earth moving machine) manufactured and owned by International Harvester Company, Inc. (Harvester), backed over him. At the time, Widson was employed by defendant James McDowell Corporation (McDowell) and was working on a school construction site on which Louetto Construction, Inc. (Louetto), was the general contractor. McDowell had leased the payscraper from Harvester.

This set of facts precipitated several interrelated claims, lawsuits and cross-actions. Widson sued Harvester for injuries based upon both product defect and negligence theories. Argonaut Insurance Company (Argonaut), the workers' compensation carrier for Widson's employer McDowell, filed a complaint in intervention against Harvester. Harvester asserted a *Witt* v. *Jackson* (57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641]) defense against this cross-action. Harvester also filed a cross-complaint for express indemnity, based upon the terms of its lease, against employer McDowell and for equitable indemnity against Louetto. Louetto in turn cross-complained against McDowell based upon an express indemnity agreement.

Widson sought to amend his complaint to add Louetto as a defendant. His motion was denied because the service of summons had not been filed within the three years as required by Code of Civil Procedure section 581a. Thereafter Widson settled his claim against Louetto for the sum of $30,000, $20,000 of which McDowell paid. The trial court approved the settlement as a good faith settlement under Code of Civil Procedure section 877.6 and dismissed Harvester's cross-complaint against Louetto.

After a trial, the jury, by special verdict, found there was a defect in design of the payscraper as well as negligence on the part of Harvester and

found Widson had suffered total monetary damages of $791,743 as a result of the accident. The jury apportioned legal fault 40 percent to Harvester, 10 percent to Widson and 50 percent to McDowell. In the judgment as entered, the total damage was reduced by 10 percent for Widson's comparative fault and by the further sum of $85,436 for workers' compensation benefits Widson had been paid, leaving a sum owing of $626,133. This sum was reduced by a credit of $30,000, the settlement payment made before trial by Louetto. The net amount of the judgment against Harvester in Widson's favor is $596,133.

We consider first the two issues raised by the appeal of Harvester from the judgment of liability and the damage award made in favor of Widson. The appeal of Harvester against McDowell and Louetto raise an additional four issues relating to different, although interrelated, problems and will be treated separately.

## DISCUSSION

## I

## WIDSON v. HARVESTER APPEAL

### A.

Harvester charges the trial court erred in excluding evidence of Cal-OSHA regulations[1] offered by Harvester in defense of its design. Secondly, Harvester contends the trial court erred in instructing the jury the payscraper was defective and not equipped with the optional safety device. Harvester also contends the trial court instructed the jury improperly as to the definition of a design defect.

On April 20, 1976, Harvester leased the payscraper to McDowell. An optional automatic backup alarm was available but not requested by McDowell. There was a lease between these parties (offered but not received in evidence) requiring McDowell to maintain the equipment and exercise due care in operating it, to comply with all laws, regulations and ordinances applicable to the use and operation of the equipment and to fully indemnify the lessor (Harvester) against any alleged or actual violations. Harvester presented evidence of its intent to install an automatic backup alarm on the

---

[1]Cal-OSHA regulations are also known as occupational safety and health standards and orders. (Lab. Code, § 6305, subd. (a).) Some of the Cal-OSHA regulations, such as that in issue on this appeal, are known as Construction Safety Orders. (See Cal. Admin. Code, tit. 8, § 1500 et seq.)

payscraper in anticipation of an alarm becoming mandatory under Cal-OSHA regulations. McDowell was contacted but refused to have the alarm installed. Later (Mar. 17, 1977) McDowell requested the installation of the alarm but Harvester had none in stock at that time. No backup alarm system was ever installed.

On April 1, 1977, Widson sustained serious injuries while working on the construction site when the payscraper backed over him; the payscraper had neither a backup alarm or an observer to direct the equipment's rearward movement.

The accident occurred in this fashion: The operator began backing up the payscraper preparatory to making another forward pass but failed to sound his airhorn, check behind him or place a worker in the area before backing. Widson had left a place of safety on an embankment and was bending over with his back to the giant machine. As the payscraper backed toward him, he did not hear its approach. He was struck and run over by its rear wheel.

Harvester sought to introduce into evidence a single Cal-OSHA regulation, section 1592, subsection (c) of title 8, California Administrative Code to show it was not in violation of the regulation but that McDowell was. The trial court ruled the regulation inadmissible.[2]

The flaw in Harvester's position is the Legislature has specifically prohibited the consideration at trial or admissibility into evidence of the Cal-OSHA regulation. Labor Code section 6304.5 unequivocally states: "It is the intent of the Legislature that the provisions of this division [which set out state-prescribed safety regulations] *shall only be applicable to proceedings against employers brought pursuant to the provisions of Chapter 3 (commencing with Section 6500) and 4 (commencing with Section 6600) of Part 1 of this division for the exclusive purpose of maintaining and enforcing employee safety.*

"Neither this division nor any part of this division shall have any application to, nor be considered in, *nor be admissible into, evidence in any personal injury or wrongful death action arising after the operative date of*

---

[2]California Administrative Code, title 8, section 1592, subdivision (c) was filed May 21, 1975 (Register 75, No. 21). Section 1592 was substantially amended in July 1980 (Register 80, No. 27). Section 1592, subdivision (a), provided, in 1975 and at the time of the accident: "Every truck with a body capacity of 2 1/2 cubic yards or more used to haul dirt, rock, concrete, or other construction material *shall be equipped with a warning device that operates automatically while the vehicle is backing. The warning sound shall be of such magnitude that it will normally be audible from a distance of 200 feet. Where conditions warrant, a signalman, in clear view of the operator, shall direct the backing operation.*" (Italics added.)

*this section, except as between an employee and his own employer.*" Every appellate court in the State of California which has considered the question of legislative intent of this section has concluded Cal-OSHA regulations are not applicable to nor admissible in an employee's action against a third person not his or her employer. The legislative intent of Labor Code section 6304.5 is patent and clear. The Cal-OSHA regulation was not admissible in this lawsuit.

In *Spencer* v. *G. A. MacDonald Constr. Co.* (1976) 63 Cal.App.3d 836 [134 Cal.Rptr. 78], the plaintiff, a roofer, sued the general contractor for injuries received when he fell from a scaffold while employed by a subcontractor. The plaintiff sought to cross-examine defendant's expert at trial concerning construction safety orders and asserted "where there is an undisputed violation of a safety order, these safety orders should be admitted . . . ." (*Id.,* at p. 857.) The Court of Appeal upheld the exclusion of evidence, ruling "[t]he meaning [of § 6304.5] could not be clearer; the safety orders are not admissible in evidence in third party actions by an employee." (*Ibid.*) Spencer also argued his own experts should be able to base their opinions on the claimed violation of safety orders. The court noted the *prohibition of the use of safety orders in a personal injury case goes beyond their admissibility as evidence.* (*Id.,* at p. 858.) The court held the expert was not only precluded by section 6304.5 from referring to construction orders but was also precluded from basing his opinion on the safety orders. (See also *Brock* v. *State of California* (1978) 81 Cal.App.3d 752 [146 Cal.Rptr. 716].) In *Salinero* v. *Pon* (1981) 124 Cal.App.3d 120 [177 Cal.Rptr. 204], the Court of Appeal stated emphatically the language of section 6304.5 is abundantly clear that evidence of Cal-OSHA regulations is "not admissible in any third party actions by an employee. . . . The exclusion of the enumerated Labor Code provisions in third-party cases is all-encompassing; no exceptions are stated." (*Id.,* at pp. 130-131.)

There have been legislative attempts to alter Labor Code section 6304.5 since 1971. With full knowledge of the appellate decisions interpreting the section's language, the Legislature has refused to amend the section.

Harvester argues while the plaintiff-employee may not rely on the Cal-OSHA regulation, a nonemployer defendant may. In effect Harvester asserts (1) the regulation defines a standard of conduct with which it complied and therefore is sufficient evidence Harvester was not negligent and (2) it is not prevented by the Labor Code section from using the regulation as a standard of conduct. Such reasoning does not stand against the clear unqualified language of section 6304.5. Cal-OSHA regulations and division 5 of the Labor Code are only applicable *"to proceedings against employers . . . for the*

*exclusive purpose of maintaining and enforcing employee safety.*" (Lab. Code, § 6304.5; italics added.)

Furthermore, Harvester has failed to demonstrate any prejudicial effect from the trial court's inadmissibility ruling. ■ Before we may reverse a judgment, we must find a miscarriage of justice. (Cal. Const., art. VI, § 13.) The appellant must show prejudice as the result of an error. (*Kuffel v. Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 567 [138 Cal.Rptr. 575].) ■ There was no miscarriage of justice for two reasons. First, Harvester has misinterpreted the Cal-OSHA regulation, arguing it requires the pay-scraper to be equipped with an automatic backup alarm or an observer directing the rearward movement of the equipment. It argues requiring a human observer excuses the failure to install a warning bell. The argument is faulty. The regulation requires a warning device and also that "[w]here conditions warrant, a signalman . . . shall direct the backing operation." Neither safety measure was in use when the plaintiff was injured. The failure of the employer to provide an observer did not exclude Harvester from liability for its failure to provide an automatic backup alarm. Secondly, Harvester introduced evidence which presented the substance of the regulation to the jury without reference to the regulation itself. For example, its expert witness James Zurek testified it was acceptable practice to use an observer in lieu of a backup warning device. The admission of the Cal-OSHA regulation would have made this fact conclusive—Harvester had not complied with the regulation by installing such a device.

### B.

■ Harvester next claims the trial court erred in giving the following instruction to the jury with regard to a defective product. "A product *is* defective if it is delivered without a safety device which is reasonably necessary to its foreseeable use, even if the safety device was offered as optional equipment."[3]

---

[3]Harvester fails to set forth the full instruction given to the jury regarding a defective product. It reads: "The manufacturer and lessor of a product is liable for injuries, a proximate cause of which was a defect in its design which existed when it left the possession of the defendant, provided that the injury resulted from a use of the product that was reasonably foreseeable by the defendant. [¶] A product is defective in design unless the benefits of the design of the product, as a whole, outweigh the risks of danger inherent in the design. [¶] In determining whether the benefits of the design outweigh such risks, you may consider, among other things, the gravity of the danger posed by the design, the likelihood that such danger will cause damage, the mechanical feasibility of a safer alternate design at the time of manufacture, the financial cost of an improved design, and the adverse consequences to the product and the consumer that would result from an alternative design. [¶] A product is defective if it is delivered without a safety device which is reasonably necessary to its foreseeable use, even if the safety device was offered as optional equipment."

Harvester extracts an isolated portion of the instruction and thereby seeks to create a defective instruction. Harvester cites *Titus* v. *Bethlehem Steel Corp.* (1979) 91 Cal.App.3d 372 [154 Cal.Rptr. 122], in support of its argument it was improper to give the instruction concerning a safety device which used the word "is" instead of the word "may." In *Titus,* the trial court refused to give an instruction requested by plaintiff defining a "product defect." The court rejected the plaintiff's proposed instructions. Harvester speculates the reason for the appellate court rejection was the wording of the instructions themselves. We disagree. The trial court in *Titus* erred because it failed to recognize the necessity of instruction on a definition of product defect. *Titus* does not discuss whether an instruction is proper if it uses "is" rather than "may." Thus Harvester improperly relies on *Titus.*

Reliance upon *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], is similarly misplaced. There, the Supreme Court stated: "We hold that a trial judge may properly instruct the jury that a product *is* defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner . . . ." (*Id.,* at p. 435; italics added.) The language used by the trial court here was the language approved in *Barker.* Further, BAJI No. 9.00.5, adopted after the *Barker* decision, uses the same language as that used here, "A product *is* defective in design . . . ." (Italics added.) Several cases have approved BAJI No. 9.00.5 since its adoption. (See *Fierro* v. *International Harvester Co.* (1982) 127 Cal.App.3d 862, 867 [179 Cal.Rptr. 923]; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 802 [174 Cal.Rptr. 348].)

Finally, by special verdict the jury found Harvester liable on both negligence and strict liability theories. The instruction complained of relates to the definition of design defect as an element in the cause of action for strict liability and is not appropriate, applicable in the cause of action for negligence. Even if we assume for purposes of argument the complained of instruction was erroneous, it only concerns one basis for liability encompassed by the verdict. Reversal is not required where there is another independent basis to support a verdict. (*Rawlings* v. *Harris* (1968) 265 Cal.App.2d 452, 454 [71 Cal.Rptr. 288].) As was stated in *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 854 [139 Cal.Rptr. 888, 93 A.L.R.3d 537], "If, of course, the jury predicated Ford's liability on a theory of strict liability, no error in the evidence relating to negligence could be prejudicial."

By the instruction, the jury was not directed to find Harvester's failure to put a backup warning device on the payscraper was a defect.

Contrary to Harvester's assertion, the instruction correctly told the jury what factors to consider in determining whether a product was defective, and the jury was fully and properly instructed on plaintiff's claims against Harvester. The judgment in favor of plaintiff James K. Widson is affirmed.

II

HARVESTER v. McDOWELL and LOUETTO

A.

Harvester asserts the trial court erred in denying its right to a jury trial on the fact issue of good faith of the settlement made by Widson with Louetto. Harvester claims this right is guaranteed by California Constitution, article I, section 16.

These are the facts underlying the settlement. Widson had filed a motion to amend his complaint to include Louetto as a defendant. The motion was denied. Thereafter, Louetto entered into a settlement with Widson for $30,000. After a hearing the court found the settlement was made in good faith and dismissed Harvester's cross-complaint against Louetto.

Harvester submits the nature of the issue before the court—ascertaining whether a settling tortfeasor's claim was made in good faith—requires a trial by a jury. Several difficulties appear in Harvester's position. First, there is no evidence such a proceeding existed at common law, let alone that a jury trial was the means for resolving the good faith issue. Second, Code of Civil Procedure section 877.6 does not by its express terms or by implication grant the parties the right to a jury trial for determination of a good faith question. Section 877.6 reads: "(a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors, upon giving notice thereof in the manner provided in Sections 1010 and 1011 at least 20 days before the hearing. Upon a showing of good cause, the court may shorten the time for giving the required notice to permit the determination of the issue to be made before the commencement of the trial of the action, or before the verdict or judgment if settlement is made after the trial has commenced.

"(b) *The issue of the good faith of a settlement may be determined by the court on the basis of affidavits . . . filed in response thereto, or the court may, in its discretion, receive other evidence at the hearing.*

"(c) *A determination by the court that the settlement was made in good faith* shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.

"(d) The party asserting the lack of good faith shall have the burden of proof on that issue." (Italics added.)

■ Our duty, where a claim is made that a statute grants the right to a jury trial, is to determine the legislative intent so as to effectuate the purpose of the statute. (*Cossack* v. *City of Los Angeles* (19740 11 Cal.3d 726, 732-733 [114 Cal.Rptr. 460, 523 P.2d 260].) ■ Patently, Code of Civil Procedure section 877.6 provides by its clear express terms for a determination of the good faith issue by *"the court"* on the basis of affidavits. There is no rational way to derive from this language a legislative intent to grant a jury trial. In *Pacific Coast Club, Inc.* v. *Brown* (1980) 107 Cal.App.3d 171 [165 Cal.Rptr. 566], the appellate court found no legislative intent to grant a jury trial where Code of Civil Procedure section 702 made no mention of a jury and directed the determination of the issues addressed by the section "'*either upon affidavit or evidence satisfactory to the court . . . .*'" (*Id.,* at p. 177.)

Nor does the legislative history of the section or public policy considerations support Harvester's position. To adopt Harvester's position would lead from the present wise policy to mischief and absurdity. The issue of good faith settlements made between codefendants would be blown out of proportion in the total trial picture, judicial time would be needlessly wasted. (*Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434, 444 [163 Cal.Rptr. 47].) Interjecting a jury trial upon every motion for a good faith settlement would effectively impede, perhaps preclude the making of good faith settlements. A jury trial would have to precede a jury trial. It would torture the language of section 877.6 to require a jury trial on this, a subsidiary issue.

Harvester in support of its argument cites several cases. *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986 [103 Cal.Rptr. 498], and others are decisions predating the enactment of section 877.6. These cases are superseded by that section. (*Wysong & Miles Co.* v. *Western Industrial Movers* (1983) 143 Cal.App.3d 278, 289 [191 Cal.Rptr. 671].)

Finally, Harvester argues the jury right existed at common law at the time the Constitution was adopted in 1850. If this were true, a jury trial would be a matter of right in a *civil action at law* but not in equity. (*Selby Con-*

*structors* v. *McCarthy* (1979) 91 Cal.App.3d 517 [154 Cal.Rptr. 164]; see *Southern Pac. Transportation Co.* v. *Superior Court* (1976) 58 Cal.App.3d 433, 436 [129 Cal.Rptr. 912].) By no stretch of the imagination can the procedure at issue be transmuted into an action at law. Under Code of Civil Procedure section 877.6 no provision is made for money damages; the relief is equitable in nature. Harvester had no right to a jury trial on the issue of good faith of the settlement made by joint tortfeasors.

B.

Harvester next contends the trial court erred as a matter of law in finding a good faith settlement between Widson and Louetto because Widson had no "viable claim" against Louetto. ■ The precise issue raised is whether Code of Civil Procedure sections 877 and 877.6 apply where the settling tortfeasor is merely a cross-defendant in an action for comparative or partial equitable indemnity and is not a defendant in the main action itself. These sections make it "very clear" the cross-defendant in a multiparty suit may make a good faith settlement with the plaintiff before trial. (*Fisher* v. *Superior Court, supra,* 103 Cal.App.3d 434, 441.) The same basic policies underlying this aspect of the sections should apply to a person who is not yet a party to the main action. The policy of the law is to discourage litigation and favor compromises of doubtful rights and controversies whether in or out of court. (*Id.,* at pp. 441-442.) Nothing in the language of *Fisher* or *American Motorcycle* (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 82, 578 P.2d 899]) limits the application of the sections solely to a "defendant." Instead sections 877 and 877.6 use the word "tortfeasor," not "defendant," thus implying a broader scope of applicability. (*City of Sacramento* v. *Gemsch Investment Co.* (1981) 115 Cal.App.3d 869, 877 [171 Cal.Rptr. 764].) Secondly, the language of section 877 is "[w]here a release . . . is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the *same tort.*" Thus the language is not limited to a claim made by a plaintiff. Rather, it implies a recognition of liability arising from one set of circumstances regardless of who makes the claim, whether it be the plaintiff directly, the defendant or third party by way of cross-complaint.

The *American Motorcycle* decision contemplates various situations in which the alleged tortfeasor is not named as a "defendant." ■ The Supreme Court noted the general rule is: "Under the governing statutory provisions a defendant is generally authorized to file a cross-complaint against a concurrent tortfeasor for partial indemnity on comparative fault basis *even when such concurrent tortfeasor has not been named a defendant in the original complaint.*" (*American Motorcycle, supra,* 20 Cal.3d at p. 607; fn. omitted; italics added.)

Finally, the strong public policy expressed in sections 877 and 877.6 is to encourage settlement by permitting a defendant or cross-defendant to settle directly with the plaintiff even though the cross-defendant's exposure is contingent upon the initial liability of the main defendant. A cross-defendant should be given the opportunity to evaluate the exposure and to buy his or her peace if he can.

One additional facet should be considered: Widson sought to name Louetto as a defendant but was precluded because of the three-year statute of limitations. It would be unreasonable to hold that because Louetto was not a defendant it lost its ability to resolve its exposure to the plaintiff. As noted above, the trial court found Louetto's settlement was made in good faith. ■ The fact the settling defendant paid less than its theoretical proportion or fair share of the plaintiff's case does not necessarily make the settlement a bad faith settlement. (*Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798, 805, 809 [173 Cal.Rptr. 38].) Code of Civil Procedure section 877.6, subdivision (d) places the burden of proof on the party who asserts the settlement was not in good faith. The good faith question is one of fact. (*Wysong & Miles Co.* v. *Western Industrial Movers, supra,* 143 Cal.App.3d 278, 290.)

■ Substantial evidence supports the trial court's determination the amount of the settlement is in fact fair. Evaluations of Louetto's potential liability ranged from zero to 10 percent of plaintiff's recovery. Counsel for Louetto expressed the view that in the worst case Louetto's exposure would tally 25 percent. Evaluations of plaintiff's total recovery ranged from $200,000 to $750,000. In such a factual context, it cannot be said the $30,000 paid by Louetto was unreasonable. (See *Wysong & Miles Co.* v. *Western Industrial Movers, supra,* 143 Cal.App.3d 278, 290.) The trial court's ruling will not be disturbed.

## C.

Harvester next argues the trial court erred in denying complete indemnification from McDowell where its "only negligence was passive." Harvester points out this truism. Where a plaintiff employee is injured in the course of his or her employment and receives workers' compensation benefits, a third party defendant may seek indemnification from the employer where there is an express agreement executed before the injury. (Lab. Code, § 3864.) From this sound premise, Harvester argues McDowell is obligated by the express indemnity provisions of its equipment lease agreement to indemnify Harvester against "*any and all loss, damage, expense and penalty arising from any claim or action on account of any injury to person* (including death) *or property* of any character whatsoever, occasioned by

the operation and *handling* or transportation *of the Equipment* during the rental period, and while the Equipment is in the possession or under the custody and control of Lessee." (Italics added.)

Civil Code section 2772 defines indemnity as a contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person. ■■■ Such indemnity provision is to be interpreted according to the language and contents of the contract and the intention of the parties as indicated by the contract. (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 254 [85 Cal.Rptr. 178, 466 P.2d 722].) ■■■ Harvester argues the language of the express indemnity provision here provides indemnity for *passive* negligence (*E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497 [146 Cal.Rptr. 614, 579 P.2d 505]) and the jury found it liable for passive rather than active negligence. The trial court denied Harvester indemnification from McDowell despite the contractual indemnification provisions.

Harvester's arguments run afoul of several rules of law. ■■■ An indemnity agreement may provide for indemnification against an *indemnitee's own negligence* but such agreement must be clear and explicit and is to be strictly construed against the indemnitee. (*Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44 [41 Cal.Rptr. 73, 396 P.2d 377].) ■■■ An indemnity clause phrased in general terms is described as a "general indemnity" clause. "[Such a clause does] not insulate the lessor against its active negligence." (*Morgan* v. *Stubblefield* (1972) 6 Cal.3d 606, 624 [100 Cal.Rptr. 1, 493 P.2d 465].) The indemnity provision under scrutiny here is of the general type for it does not specifically address the effects of Harvester's negligence on its right to indemnity. A general indemnity clause has been construed to provide indemnity for a loss resulting in part from an indemnitee's *passive* negligence, but it will not be interpreted to provide indemnity if the indemnitee has been *actively* negligent. (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97]; *Morgan* v. *Stubblefield, supra,* 6 Cal.3d at p. 624.)

■■■ It is true Harvester was found passively negligent, but the jury also found it strictly liable. Thus the applicable, controlling law is found in the factual context of *strict liability* and an express general indemnity provision. California courts have consistently equated strict liability with negligence for purposes of construing indemnification agreements. In *Dart Transportation Service* v. *Mack Trucks, Inc.* (1970) 9 Cal.App.3d 837, 848 [88 Cal.Rptr. 670], the court said: "While an action based upon a manufacturer's strict liability or breach of warranty liability does not sound in negligence, we believe, upon parity of reasoning, that the rule of construc-

tion applicable to an agreement where one seeks indemnification from his own negligence is equally applicable here."

In *Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245, 256, the indemnity clause was substantially identical to the clause at issue in this case: " 'Lessee shall indemnify Shell against any and all claims and liability for injury or death of persons or damage to property caused by or happening in connection with the equipment or the condition, maintenance, possession, operation or use thereof.' "

The trial court nonsuited Shell on the ground the indemnity clause was in general terms and Shell was either actively negligent or strictly liable which the court considered "to be 'in the same category.' " (*Price* v. *Shell Oil Co., supra,* at p. 256.) Shell appealed, arguing its liability under the products liability clause amounted to no more than passive negligence and therefore did not preclude indemnity even under a general indemnity clause. The Supreme Court disagreed, saying: "In the indemnity clause before us in the instant case, there is no language 'expressly and unequivocally' requiring Flying Tiger to indemnify Shell for liability or damages caused by Shell's own act in furnishing a defective tank truck or its equipment." (*Id.,* at pp. 257-258.)

■ If McDowell as an indemnitor is to be held responsible for the liability to an indemnitee-lessor such as Harvester, a party found guilty of furnishing a defective product, the language imposing such a liability must do so expressly, must unequivocally so state, so that the contracting parties are advised of the terms and the liability to which they are exposed. (See *Goldman* v. *Ecco-Phoenix Elec. Corp., supra,* 62 Cal.2d 40, 41.)

■ Finally, it would thwart basic public policy behind strict liability to permit indemnification of a strictly liable defendant under a general indemnity clause. As was said in *Dart Transportation Service* v. *Mack Trucks, Inc., supra*: "[A] manufacturer is strictly liable in tort for injuries resulting from a defectively manufactured product, and that the manufacturer may not limit or abrogate such liability by contract. [Citations.] We are of the opinion that the language of the indemnification agreement, coupled with the circumstances under which it was executed did not create, and was never intended to create, an obligation on the part of Dart, a consumer of the article who is within the class the doctrine of strict liability is designed to protect, to indemnify Mack for damages to person or property resulting from defects in the manufacture of the leased vehicles." (9 Cal.App.3d at p. 849.) (See also *Price* v. *Shell Oil Co., supra,* 2 Cal.3d at p. 258.)

Since *Price* the Legislature has seen fit to make its position even clearer, declaring such agreements as here tendered "for defects in design furnished

by such persons, are against public policy and are void and unenforceable . . . ." (Civ. Code, § 2782.)

### D.

Harvester is also prohibited from taking any action for equitable or partial indemnity against McDowell, Widson's employer, by virtue of Labor Code section 3864. Any entitlement to indemnification on the part of Harvester must be by virtue of *express* contractual indemnity. As we have found, the agreement here does not provide for any such indemnity. To allow a third party tortfeasor to secure partial or equitable indemnity from an employer in this circumstance except on the basis of a specific written indemnity clause authorizing it would be to permit an "end run" around the workers' compensation law exclusive remedy proviso, thereby enlarging the employer's obligation beyond that limited by the public policy and statutes of this state. While in some jurisdictions equitable indemnity is permitted (see *Dole v. Dow Chemical Co.* (1972) 30 N.Y.2d 143 [331 N.Y.S.2d 382, 282 N.E.2d 288, 53 A.L.R.3d 175]), California has not so extended its laws.

The judgment is in all respects affirmed.

Cologne, Acting P. J., and Butler, J., concurred.

A petition for a rehearing was denied April 12, 1984, and appellant's petition for a hearing by the Supreme Court was denied May 17, 1984.